**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

ALEXIS A. FIGUEREO,

                              Plaintiff**,**

              **v.**                                                    1:23-cv-00922 (AMN/PJE)

THE CITY OF SARATOGA SPRINGS, et al.,

                              Defendants**.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **LAW OFFICE OF MARK S. MISHLER, PC**<br>744 Broadway - 2d Floor<br>Albany, New York 12207<br>*Attorneys for Plaintiff* | **MARK S. MISHLER, ESQ.** |
| **SMITH, SOVIK, KENDRICK**<br>**& SUGNET, P.C.**<br>250 South Clinton Street, Suite 600<br>Syracuse, New York 13202-1252<br>*Attorneys for Defendant the City of*<br>*Saratoga Springs* | **KAREN G. FELTER, ESQ.** |
| **GOLDBERG SEGALLA, LLP**<br>8 Southwoods Boulevard, Suite 300<br>Albany, New York 12211-2526<br>*Attorneys for Defendant Meg Kelly* | **JONATHAN M. BERNSTEIN, ESQ.** |
| **WILSON ELSER MOSKOWITZ**<br>**EDELMAN & DICKER, LLP**<br>200 Great Oaks Blvd, Suite 228<br>Albany, New York 12203<br>*Attorneys for Defendant Robin Dalton* | **ANDREW S. HOLLAND, ESQ.** |
| **FITZGERALD MORRIS BAKER**<br>**FIRTH, P.C.**<br>68 Warren Street<br>Glens Falls, New York 12801<br>*Attorneys for Defendants Shane L. Crooks*<br>*and John T. Catone* | **COREY A. RUGGIERO, ESQ.**<br>**JOHN D. ASPLAND, ESQ.** |

**BURKE, SCOLAMIERO LAW FIRM**   **KEVIN P. BURKE, ESQ.**
7 Washington Square       **JUDITH B. AUMAND, ESQ.**
Albany, New York 12205
*Attorneys for Defendants Saratoga County*
*and Michael Zurlo*

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION & ORDER**

## I. INTRODUCTION

Plaintiff Alexis A. Figuereo brings this action pursuant to 42 U.S.C. § 1983 asserting that the City of Saratoga Springs, Mayor Meg Kelly, Commissioner of Public Safety Robin Dalton, Chief of Police Shane L. Crooks, Assistant Chief of Police John T. Catone, Saratoga County, Sheriff Michael Zurlo, and John Does 1-100 (collectively "Defendants") violated his constitutional rights through actions taken in response to a protest on July 30, 2020.[1]  Presently before the Court are four separate motions to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motions").  *See* Dkt. No. 33; Dkt. No. 36; Dkt. No. 37; Dkt. No. 39.[2]  Plaintiff responded to each motion to dismiss.  *See* Dkt. No. 44; Dkt. No. 45; Dkt. No. 46; and Dkt. No. 47.  In turn, each of the moving defendants filed replies.  *See* Dkt. No. 49; Dkt. No. 51; Dkt. No. 53; Dkt. No. 52.

For the reasons set forth below, Defendants Zurlo and Saratoga County's motion to dismiss is granted, and the remaining Motions are denied.

---

[1] This case was reassigned to the undersigned on October 21, 2024.  *See* Dkt. No. 57.

[2] The operative pleading is the First Amended Complaint ("FAC" or "AC"), which was filed on November 27, 2023. *See* Dkt. No. 27.

## II.    BACKGROUND

### A.    Overview

Plaintiff alleges that on July 30, 2020, he was involved in a peaceful protest concerning racial justice and police accountability in the City of Saratoga Springs, New York.  AC at ¶¶ 1-2.[3]  He contends that most of the participants in this peaceful protest were people of color. *Id.* at ¶ 1.  Simultaneously, and in approximately the same location, Plaintiff alleges that there was also "a so-called 'Back the Blue' or support for law-enforcement rally."  *Id.* at ¶ 3.  The Back the Blue rally was allegedly attended mostly by white people.  *Id.*  Plaintiff contends that the two protests on July 30, 2020 "were handled in starkly different manners by the defendant municipalities and municipal officials, reflecting express and *de facto* municipal policies, practices, and customs to favor the 'Back the Blue' protestors over the racial justice and police accountability activists."  *Id.* at ¶ 4.  Generally, Plaintiff contends that the law enforcement officers present acted pursuant to the direction of the City of Saratoga and Saratoga County, and officials of those municipalities including then Mayor Meg Kelly, then Commissioner of Public Safety Robin Dalton, then Chief of Police Shane L. Crooks, then Assistant Chief of Police John T. Catone, and Saratoga County Sheriff Michael Zurlo ("individually named defendants").  *Id.* at ¶ 5.  Plaintiff alleges that all Defendants planned to and did respond to the racial justice protests by using hostile, violent, and aggressive tactics against the racial justice protestors while simultaneously responding to the "Back the Blue" rally with no aggression despite some of the Back the Blue protestors' hostile behavior.  *Id.* As a result of the law enforcement response, Mr. Figuereo was hit multiple times with

---

[3] The Court accepts as true all non-conclusory factual allegations and draws all reasonable inferences in Plaintiff's favor. The Court does not credit legal conclusions presented as factual contentions.

projectiles and exposed to a form of pepper spray, which he alleges caused him pain and suffering. *Id.* at ¶ 7. Plaintiff alleges that law enforcement's actions were taken to "chill the exercise of First Amendment protected rights." *Id.* at ¶ 8.

**B.    The Parties**

Plaintiff is African American and grew up in the City of Saratoga Springs. *Id.* at ¶ 14. He alleges that he is a "well-known and recognized leader and organizer of the local movement for racial justice and police accountability" in Saratoga Springs. *Id.* at ¶ 42.

The City of Saratoga Springs ("City") is a duly authorized municipal corporation which Plaintiff alleges was the employer of Defendants Kelly, Dalton, Crooks, and Catone, as well as of the 'John Doe' defendants who were City of Saratoga Springs police officers or officials. *Id.* at ¶ 15. Plaintiff contends that Meg Kelly was, at all times relevant to this case, the elected Mayor of the City and a member of the City of Saratoga Springs City Council with oversight responsibilities and policy-making authority over the City of Saratoga Springs Police Department. *Id.* at ¶ 16. Plaintiff asserts that Robin Dalton was, at all times relevant to this case, the elected Commissioner of Public Safety for the City, the head of the Department of Public Safety, and also a member of the City of Saratoga Springs City Council with oversight and management responsibilities and policy-making authority over the City of Saratoga Springs Police Department. *Id.* at ¶ 17. Plaintiff maintains that Shane L. Crooks was, at all times relevant to this case, the appointed Police Chief for the City and held oversight and management responsibilities, supervisory responsibilities, and policy-making authority over the City of Saratoga Springs Police Department. *Id.* at ¶ 18. Plaintiff alleges that John T. Catone was, at all times relevant to this case, the appointed Assistant Chief of Police for the City and held oversight and management responsibilities, supervisory

responsibilities, and policy-making authority over the City of Saratoga Springs Police Department. *Id.* at ¶ 19.

Saratoga County ("County") is a duly authorized municipal corporation that was, at all times relevant to this case, the employer of all the "John Doe" Defendant Saratoga County Sheriff's Department officers and officials. *Id.* at ¶ 20. Plaintiff contends that that Michael Zurlo was, at all times relevant to this case, the elected Sheriff of Saratoga County and held oversight responsibilities, supervisory responsibilities, and policy-making authority over the Sheriff's Department. *Id.* at ¶ 21.

Finally, Plaintiff asserts that JOHN DOES 1-100 represent City of Saratoga Springs police officers or officials, County of Saratoga Sheriff's Department officers or officials, New York State Police officers or officials, and New York State Park Police officers or officials who were present at or near the Broadway entrance to Congress Park in the City of Saratoga Springs in the evening of July 30, 2020, during the time period of approximately 8:00 pm to approximately 9:00 pm, and who participated in violating plaintiff's rights or failed to intervene to prevent the violation of Plaintiff's rights. *Id.* at ¶ 22.

## C.    Events of July 30, 2020

The FAC details events on the evening of July 30, 2020, in the vicinity of Congress Park, a municipal, public park in the City of Saratoga Springs, New York. *Id.* at ¶ 23. As background, Plaintiff contends that law enforcement officers and officials in the City, including Defendants Kelly, Dalton, Crooks, and Catone, were openly hostile to the emergence and growth of a national racial justice and police accountability movement in the Spring and Summer of 2020. *Id.* at ¶¶ 27-30. The FAC alleges that on July 30, 2020, a group

of purportedly pro-law enforcement individuals held a "Back the Blue rally," and local racial justice and police accountability activists decided to hold a counter-rally. *Id.* at ¶¶ 43-45.

As to the two protests, Plaintiff contends that "Saratoga Springs Police Department officers and officials were present from the beginning of the 'Back the Blue' rally, and the counter rally" in which Plaintiff participated, but that "[f]rom the beginning, the attention of the police was focused on the racial justice and police accountability protesters, despite the fact that some of the 'Back the Blue' protestors were openly hostile and were threatening to the racial justice and police accountability protesters." *Id.* at ¶ 47-48. Plaintiff alleges that multiple other law enforcement agencies were present, including the Saratoga County Sheriff's Department, the New York State Police, and the New York State Park Police. *Id.* at ¶¶ 55-56. Plaintiff also alleges that the Saratoga County Sheriff's Department participated by bringing a large, armored vehicle and officers wearing riot gear to deploy pepper balls and projectiles. *Id.* at ¶¶ 58-59.

During the events in question, Plaintiff alleges that the racial justice and police accountability protestors ("RJPA protestors"), including himself, "engaged in peaceful protest actions" in Congress Park, on Broadway, and in front of Saratoga Springs City Hall. *Id.* ¶ 64. He further contends that by 8:30 pm or 8:45 pm on July 30, 2020, the RJPA protestors, including himself, were mainly gathered near the Broadway entrance to Congress Park in Saratoga Springs and were "peacefully assembled in and near the roadway at that time. Some formed a line of individuals that stretched across part of the roadway . . . . [and were] peacefully standing in a line, chanting." *Id.* ¶ 65-66.

Despite the allegedly peaceful nature of their protest, Plaintiff alleges that law enforcement used violent dispersal tactics against the RJPA protestors. According to the FAC,

around 8:30-8:45 pm, dozens of law enforcement officers gathered in the vicinity of the Broadway entrance to Congress Park, including mounted officers, heavily armed officers, officers in riot gear, and officers carrying weapons designed to shoot pepper balls or projectiles. *Id.* at ¶ 67. Defendant Dalton was also present at the scene and "witnessed everything." *Id.* at ¶ 68. Around the same time, the large, armored vehicle supplied by the Saratoga County Sheriff's Department arrived on the scene and was filled with additional officers in riot gear. *Id.* at ¶ 69. Plaintiff alleges that Defendant Crooks and Catone authorized and directed the use of pepper balls and projectiles and that they ordered the assembled officers to make arrests. *Id.* at ¶¶ 70, 72. Officers on the scene verbally identified to one another Plaintiff's location among the protestors. *Id.* at ¶ 76. "[A]ll of a sudden," the officers on the scene began to grab individual protestors and shoot pepper balls or projectiles directly towards the RJPA protestors rather than towards the ground. *Id.* at ¶¶ 77-78. Plaintiff was hit several times by these projectiles, including on his arm, and he alleges that the projectiles caused the parts of his body that were hit to feel like they were on fire. *Id.* at ¶¶ 79-80. He also alleges that the projectiles burst open and released pepper spray or a similar substance, which caused extreme pain and discomfort, made it difficult to breathe, and triggered an asthma attack. *Id.* at ¶¶ 81-82. Plaintiff also alleges that no law enforcement officers, officials, or Defendants gave a directive to the RJPA protestors to disperse, or that at least any such direction given was not able to be heard by most of the protestors present. *Id.* at ¶ 86.

Later, Plaintiff alleges that "[a]fter the police shot pepper balls or projectiles and made three minor arrests, [D]efendant Crooks decided to have all of the police pull-back and withdraw." *Id.* at ¶ 89. After the police withdrew, no further force was used, and the protestors dispersed about an hour later without further police interaction. *Id.*

Again, Plaintiff asserts that the individually named Defendants were the decision-makers responsible for this response. *Id.* at ¶ 49. The FAC also alleges that on August 4, 2020, just days after the incident, Defendants Crooks and Catone issued a public statement in which they explicitly took responsibility for calling in other police departments for assistance the day before the protests and using pepper balls and projectiles. *Id.* at ¶ 50. Defendant Dalton later read the statement into the record at a City Council meeting and stated that she "st[oo]d by the actions of the Saratoga Springs Police Department on the night of July 30th." *Id.* at ¶ 52. Plaintiff also alleges specifically that Defendant Zurlo agreed to provide the armored vehicle, officers in riot gear, and officers armed with weapons designed to shoot pepper balls and projectiles after the City requested such support. *Id.* at ¶ 61.

Regarding the motivation for these actions, Plaintiff alleges that Defendants acted, at least in part, out of racial animus towards Mr. Figuereo and the other RJPA protestors, many of whom were also people of color. *Id.* at ¶ 91. The FAC also alleges that the purpose of the response was to chill the RJPA protestors' First Amendment rights. *Id.* at ¶¶ 8, 9.

**D.    Later Hostility**

Plaintiff alleges a number of facts pertaining to a similar protest in July 2021 to support the notion that Defendants had hostile intent toward the RJPA protestors when responding on July 30, 2020. Of particular import, Plaintiff alleges the existence of law enforcement "operational plans" to deal with RJPA protests. *Id.* at ¶¶ 33, 34. Plaintiff alleges that one of these "operational plans" from July 2021 included instructions for officers to "look out for" Plaintiff and one other activist and included their photos. *Id.* Upon information and belief, Plaintiff alleges that Defendants Kelly, Dalton, Crooks, and Catone developed a similar "operational plan" for the July 30, 2020 protest. *Id.* at ¶¶ 39, 40. The FAC also provides facts

related to text messages sent by Defendants Kelly and/or Dalton to Defendants Crooks and/or Catone in 2021.  *Id.* at ¶ 35.  For example, Plaintiff alleges that in July 2021, during a RJPA protest in the City, Defendant Dalton texted Defendant Crooks that she had "bloodlust" towards the protestors, and she also directed Defendant Crooks to make arrests, texting him, "arrest those f___ers", "ARREST", "if someone doesn't get arrested I'm going to lose my mind", and "please please please pretty please arrest someone."  *Id.* at ¶ 36.  Though many these specific demonstrations of alleged hostility occurred a year after the events at issue in this case, Plaintiff alleges that they evidence a pattern of hostile intent.  *Id.* at ¶ 38.

### E.    Claims

Plaintiff sets forth four causes of action, the first three of which are asserted against all Defendants. The first alleges excessive force in violation of the Fourth and Fourteenth Amendments.  *Id.* at ¶¶ 99-100.  The second alleges an equal protection violation.  *Id.* at ¶¶ 101-02.  The third alleges a First Amendment violation, and asserts that Defendants' actions on July 30, 2020 infringed upon Plaintiff's freedom of speech, freedom of assembly, freedom of association, and freedom to petition the government for a redress of grievances.  *Id.* at ¶¶ 103-04.  The Court construes the fourth cause of action as asserting the first three claims against the City and the County as a *Monell* claim.  *Id.* at ¶ 106.

### III.    STANDARD OF REVIEW

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of a party's claim for relief.  *See Patane v. Clark*, 508 F.3d 106, 111–12 (2d Cir. 2007).  In considering legal sufficiency, a court must accept as true all well-pled facts in the complaint and draw all reasonable inferences in the pleader's favor.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).   This presumption, however, does not extend to legal

conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleadings, the court may consider documents that are "integral" to the pleadings even if they are neither physically attached to, nor incorporated by reference into, the pleadings. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir.2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to sho[w] that the pleader is entitled to relief," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (alteration in original) (quotation omitted). Under this standard, a pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed," *id.* at 570.

## IV. DISCUSSION

### A. ATTORNEY GENERAL'S FEBRUARY 20, 2024 REPORT

In opposition to each of the motions, Plaintiff requests that the Court consider a document from the New York State Attorney General's Office titled "A Report on the Saratoga Springs Police Department's Response to Protests in 2021," dated February 20, 2024. *See* Dkt. No. 47-1 ("AG

Report" or "the Report"). Plaintiff contends that the Report was the result of a lengthy investigation undertaken by the New York State Attorney General's Office into the conduct of the Saratoga Springs Police Department and City officials in response to the activities of local Black Lives Matter activists, including Figuereo. Dkt. No. 47 at 9. Plaintiff argues that it is appropriate to incorporate by reference the Report, which was issued after the FAC, into the FAC for the Court's consideration of the motions to dismiss. *Id.* at 10. Plaintiff points out the Report is a public record and that all Defendants knew about the Report at the time of the initial complaint and the FAC. *Id.* Plaintiff further contends that the FAC is sufficient on its face regardless of whether the Report is incorporated. *Id.* at 22 n.8. The moving Defendants oppose the Court's consideration of this document.

On a Rule 12(b)(6) motion to dismiss, a court "may review only a narrow universe of materials," which includes "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, ... matters of which judicial notice may be taken," and "document[s] not expressly incorporated by reference in the complaint [that are] nevertheless 'integral' to the complaint." *Goel v. Bunge, Ltd.,* 820 F.3d 554, 559 (2d Cir. 2016) (internal citation omitted). The AG Report is not attached to the FAC, and indeed, the AG Report is dated approximately three months after the FAC was filed. Dkt. No. 47-1. Rather, Plaintiff proffers two purported bases to justify the Court's consideration of the AG Report.

First, Plaintiff submits that "[t]he *anticipated* issuance of the Report was *contemplated* and referenced in the allegations of the FAC," Dkt. No. 46 at p. 10, and that the AG Report "is *essentially* a document *incorporated into the FAC.*" *Id.* at 13 n. 4 (emphasis added). However, notwithstanding Plaintiff's use of the term "essentially," the FAC fails to mention the AG Report, *see generally* Dkt. No. 27, much less make a "clear, definite, and substantial reference" to it. *See*

*Waite v. EAN Holdings, LLC*, 5:21-cv-538, 2022 WL 991400, at *3 (N.D.N.Y. Apr. 1, 2022) (quoting *BankUnited, N.A. v. Merritt Env't Consulting Corp.*, 360 F. Supp. 3d 172, 183 (S.D.N.Y. 2018)).  Instead, the FAC only mentions a purported "civil rights investigation initiated and conducted by the NYS Department of Law."  Dkt. No. 27 at ¶ 38.  Moreover, the fact that the Report is dated February 20, 2024 (*i.e.,* nearly three months after the filing of the FAC on November 11, 2023) confirms that there was no such Report in existence at the time of the filing of the FAC and, thus, nothing to be referenced, much less *incorporated* by reference, in the FAC.  The Court finds that the AG Report is not incorporated by reference into the FAC.

Further, Plaintiff fails to establish that the AG Report could be considered a document integral to the FAC.  Where a complaint "relies heavily upon [a document's] terms and effect," the document is "integral to the complaint and, accordingly, a fair object of consideration on a motion to dismiss." *Goel*, 820 F.3d at 559 (internal quotation marks omitted).  "A document is integral to the complaint where the plaintiff (1) has 'actual notice' of the document and its information and (2) has 'relied upon the[] document[] in framing the complaint.'"  *McLennon v. City of New York*, 171 F. Supp. 3d 69, 89 (E.D.N.Y. 2016) (alteration in original) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  "Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotations from the document is not enough." *Goel*, 820 F.3d at 559 (alteration, internal quotation marks and citations omitted).  Given that the AG Report did not exist at the time Plaintiff drafted the FAC, precluding actual notice of the information in the Report, there can be no meritorious argument that the AG Report is integral to the complaint.

Second, Plaintiff submits that the AG Report may be considered because it "is a public record of a governmental agency."  *See* Dkt. No. 47 at 13 n. 4.  To the extent that Plaintiff is arguing that the Court can take judicial notice of the contents of the AG Report, rather than its existence,

the argument is misplaced. While Courts may take judicial notice of the records of administrative bodies, *see, e.g., Doroz v. Deiorio's Foods,* 437 F. Supp. 3d 140, 155 n.3 (N.D.N.Y. 2020) (citation omitted), they may only take judicial notice of "a fact that is not subject to reasonable dispute[.]" *Press v. Primavera*, 685 F. Supp. 3d 216, 224 (S.D.N.Y. 2023) (citation omitted). Facts that are not subject to reasonable dispute include two categories: "matters of common knowledge and facts capable of verification." *United States v. Bari*, 599 F.3d 176, 180 (2d Cir. 2010) (internal quotation marks and citation omitted). Such contents must be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Fair Haus. Justice Ctr. Inc. v. Lighthouse Living LLC,* 20 CV 4066 (NSR), 2021 WL 4267695, at *3 (S.D.N.Y. Sep. 20, 2021) (citation omitted). Plaintiff has failed to make a showing that the AG Report's contents—which purportedly include "Factual Findings" and "Legal Findings"—is common knowledge and/or comes from an unimpeachable source whose accuracy cannot reasonably be questioned such to qualify for judicial notice under Fed. R. Evid. 201(b). *See, e.g., Jeffery v. City of New York*, 113 F.4th 176, 181 (2d Cir. 2024) (refusing to judicially notice a City Department of Investigation Report's interpretation and assessment of the efficacy of the New York City Police Department's response to certain events); *see also Bazile v. City of New York Dept. of Educ.*, 12 Civ. 6267(ILG)(MDG), 2013 WL 3495936, at *2 (E.D.N.Y. July 11, 2013) (refusing to consider the content of reports compiled in an investigation into the New York City School District). Accordingly, the Court declines to take judicial notice of the AG report's contents but does take notice of its existence.

Finally, Plaintiff asserts in a footnote that, "[i]n the alternative, the Court may, pursuant to FRCP 12 (d), convert these motions to motions for summary judgment pursuant to FRCP 56 and adjourn determinations of these motions until at least some discovery has been completed so as to permit all parties the opportunity to more fully state their positions." Dkt. No. 47 at 13 n. 4.

However, the "ultimate decision of whether to convert a Rule 12(b)(6) motion into a Rule 56 motion is discretionary." *Fernandez v. Windmill Distib. Co.*, 159 F. Supp. 3d 351, 357 (S.D.N.Y. 2016). Defendants, in at least one motion, contend that the Court should not convert the motions. *See* Dkt. No. 53 at 6-7. Moreover, "[c]ourts in this Circuit have made clear that a plaintiff may not shore up a [possibly] deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss." *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 122-23 (S.D.N.Y. 2010) (citation omitted). Because the AG Report by its terms primarily concerns conduct in Saratoga Springs in 2021, well after the events in issue here occurred, and because the AG Report was not referenced or incorporated in the FAC, the Court will decline to convert the pending motions to motions for summary judgment, and instead will determine these motions based upon the allegations in the FAC alone.

## B.    EXCESSIVE FORCE CLAIMS

The Court moves on to assess Plaintiff's first cause of action for excessive force.

### 1.    Fourth or Fourteenth Amendment

Though Plaintiff's First Cause of Action alleges an excessive force claim under the Fourth and Fourteenth Amendments against all Defendants, only one can survive. FAC at ¶ 100. "When a plaintiff brings both Fourth and Fourteenth Amendment claims that arise out of the same conduct by defendants, the two claims may not proceed simultaneously." *Fraser v. City of New York*, 20-CV-5741 (NGG) (RER), 2022 WL 3045524, at *2 (E.D.N.Y. Aug. 1, 2022) (citations omitted). "In these circumstances, courts must 'identif[y] the specific constitutional right allegedly infringed by the challenged application of force' and judge the claim by 'reference to the specific constitutional standard which governs that right.'" *Id.* (citation omitted). "Excessive force claims arising out of an arrest or seizure are evaluated under the Fourth Amendment using an 'objective

reasonableness' standard." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Where plaintiffs do not allege seizure, courts analyze the use of excessive force under the Fourteenth Amendment's "shocks the conscience" standard, though the Second Circuit has made clear that the standards both require an assessment of objective reasonableness in the excessive force context. *See Edrei v. Maguire*, 892 F.3d 525, 536 (2d Cir. 2018) (clarifying that the Fourteenth Amendment's "conscience shocking" standard is satisfied where the alleged force was objectively unreasonable and done knowingly and that the standard does not require subjective intent); *see also Abujayyab v. City of New York*, 15 Civ. 10080 (NRB), 2018 WL 3978122, at *5 (S.D.N.Y. Aug. 20, 2018) (noting that *Edrei* altered the historic use of a higher "shocks the conscience" standard and clarified that Fourteenth Amendment excessive force claims are subject to the objectively unreasonable standard); *cf. Tennyson v. Francemore*, 16-cv-929 (BKS/MJK), 19-cv-678 (BKS/MJK), 2024 WL 3398364, at *17 (N.D.N.Y. July 12, 2024) (applying the objectively unreasonable test to a Fourteenth Amendment excessive force claim); *Harding v. Gould*, 22 CV 6285 (VB), 2024 WL 3742688, at *5-6 (S.D.N.Y. Aug. 9, 2024) (comparing the Fourth and Fourteenth Amendment objective reasonableness standards and applying both where it was unclear which governed the plaintiff's claims).

Here, though Plaintiff alleges that "police on the scene began to grab individual protesters and shoot pepper balls or projectiles towards" the protestors, and that the police "made three minor arrests," Plaintiff does not allege that he was grabbed or that the police physically attempted to arrest him. *See* FAC at ¶¶ 77, 89. However, because Plaintiff contends that the police used military-grade and chemical weapons (pepper balls) against him and the other protesters to facilitate arrests, the Court will deem Plaintiff and the other protesters to have been seized for purposes of the Fourth Amendment and apply the objectively reasonable standard. *See, e.g.*,

*Flannery v. City of Rochester*, 640 F. Supp. 3d 267, 280 (W.D.N.Y. 2022) ("Courts have routinely concluded that the use of such weapons against protestors constitutes a seizure for purposes of the Fourth Amendment."); *Pluma v. City of New York*, 13 Civ.2017(LAP), 2015 WL 1623828, at *4 (S.D.N.Y. Mar. 31, 2015) (finding "the trend among federal courts and common sense support the conclusion that the blinding and disorienting effects of pepper spray temporarily incapacitated Plaintiff such that he was unable to walk away[,]" and thus, the use of such weapons constituted a Fourth Amendment seizure). Defendants appear to have conceded that the Fourth Amendment applies, and thus the use of the objectively unreasonable standard is appropriate. *See* Dkt. No. 33-1 at 10; Dkt. No. 36-2 at 16-17; Dkt. No. 37-2 at 11; Dkt. No. 39-2 at 15.[4]

**2.    Use of Force Against Plaintiff**

In assessing whether force was objectively reasonable under the Fourth Amendment, a court should pay "'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Soares v. Connecticut*, 8 F.3d 917, 921 (2d Cir. 1993) (quoting *Graham*, 490 U.S. at 396). This standard focuses on "'a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015) (quoting *Graham*, 490 U.S. at 397). The reasonableness determination must include consideration of the fact that law enforcement officers often are forced to make quick decisions under stressful and

---

[4] If the Court were to ultimately find that Plaintiff was not seized for purposes of the Fourth Amendment, the Fourteenth Amendment would still apply. *See Rothman v. City of New York*, 19 Civ. 0225 (CM), 2019 WL 3571051, at *8-9 (S.D.N.Y. Aug. 5, 2019) (reviewing claims under the Fourteenth Amendment after determining that no seizure took place).

rapidly evolving circumstances, which may render the calculation of what amount of force is reasonable difficult.  *See Graham*, 490 U.S. at 396-97.

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal citation omitted).  The Supreme Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* "The police are not required to utilize the least amount of force possible to place someone into custody." *Brennan v. City of Middletown*, No. 18 Civ. 6148, 2020 WL 3820195, at *7 (S.D.N.Y. July 8, 2020).

"Moreover, to support an excessive force claim, the plaintiff must establish that the defendant used more than *de minimis* force." *Durr v. Slator*, 558 F. Supp. 3d 1, 16 (N.D.N.Y. 2021) (citing *Feliciano v. Thomann*, 747 Fed. Appx. 885, 887 (2d Cir. 2019)).  "Even conduct that caused some physical pain and resulted in side effects need not be compensated if a jury finds that such injuries were *de minimis.*" *Id.* (citing *Kerman v. City of New York*, 374 F.3d 93, 123 (2d Cir. 2004)).  However, regardless of the amount of force, "a show of force by an officer that is overly disproportionate to the risk of harm may support a claim for excessive force." *Id.* (citing *Gersbacher v. City of New York*, No. 1:14-cv-7600, 2017 WL 4402538, *11 (S.D.N.Y. Oct. 2, 2017)).

Here, Plaintiff has made several allegations sufficient to establish the use of objectively unreasonable force at the motion to dismiss stage.  Plaintiff alleges that he was peacefully protesting when the police shot and hit him with pepper balls.  FAC at ¶¶ 75, 79.  He also alleges that the projectiles caused him physical pain including making his skin feel as if it "was on fire," causing "extreme pain and discomfort to his eyes," and inducing "great difficulty breathing[.]"  *Id.*

at ¶¶ 79-83.  Such harms are more than "*de minimis*" and instead, are examples of the kinds of harms which regularly sustain excessive force claims under the objectively unreasonable standard. *See Quinones v. Rollison*, 18-cv-1170 (AJN), 2020 WL 6420181, at *4 (S.D.N.Y. Nov. 1, 2020) ("The use of pepper spray 'constitutes a significant degree of force' and can in certain cases form the basis of a constitutional violation" (quoting *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010))); *Rodriguez v. City of New York*, 14 Civ. 8647 (PGG) (FM), 2016 WL 5476003, at *6 (S.D.N.Y. Sep. 29, 2016) ("Plaintiff has pled sufficient facts concerning the effect of the spray on him to survive a motion to dismiss"); *see also Porath v. Bird*, 9:11-cv-963 (GLS/CFH), 2013 WL 2418253, at *7 (N.D.N.Y. June 3, 2013) ("even if the injuries suffered were neither permanent nor severe, a plaintiff may still recover under the Fourth Amendment if the force used was unreasonable and excessive.").  Moreover, that the FAC suggests Plaintiff and the other RJPA protestors were protesting on the streets does not establish that the law enforcement actions were objectively reasonable.  Dkt. No. 36-2 at 19; Dkt. No. 37-2 at 12; Dkt. No. 39-2 at 16.[5]  Read favorably to Plaintiff, the FAC does not allege that the protestors in the street were interfering with traffic.  More importantly, taking Plaintiff's allegations of peaceful protest as true, it is plausible that the use of force was disproportionate to the risk of harm posed by Plaintiff as a protestor or any disruption of traffic in the area, especially in light of the allegation that there was no effective dispersal order prior to the use of force.  FAC at ¶ 86.  Accordingly, Plaintiff has plausibly alleged the use of objectively unreasonable force.  However, the inquiry does not end there.

---

[5] Defendant Dalton's citation to *Jones v. Parmley* is unavailing.  465 F.3d 46, 56-57 (2d Cir. 2006). There, the court was assessing whether police action violated a First Amendment right, not whether it was objectively reasonable under the Fourth Amendment.  Additionally, the case notes that "Neither energetic, even raucous, protesters who annoy or anger audiences, nor demonstrations that slow traffic or inconvenience pedestrians, justify police stopping or interrupting a public protest."  *Id.* at 58.

### 3. Personal Involvement in Excessive Force

"[I]t is well settled that, in order to establish a defendant's individual liability in a suit brought under [42 U.S.C.] § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Morabito v. New York*, 803 Fed. Appx. 463, 466 (2d Cir. 2023) (quoting *Grullon v. City of New Haven,* 720 F.3d 133, 138 (2d Cir. 2013)). "Pursuant to this requirement, a Section 1983 plaintiff must allege a tangible connection between the acts of the defendant and the injuries suffered." *Keyes v. Venettozzi*, No. 9:18-CV-0372 (GTS/DJS), 2022 WL 991402, at *6 (N.D.N.Y. Mar. 31, 2022) (quotation and internal quotation marks omitted). In other words, "the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained." *Durr*, 558 F. Supp. 3d at 20 (citations omitted).

Previously, supervisors could be subjected to Section 1983 liability for the conduct of their subordinates based on a specific set of unique factors. *See Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). That is no longer the case, and instead, "there is no special rule for supervisory liability." *Id.* Now, to be liable, a supervisor must "violate[] the constitution by his or her 'own conduct, not by reason of [their] supervision of others who committed the violation.'" *Encarnacion v. Connors*, No. 9:21-cv-00986-MAD-TWD, 2023 WL 6546247, at *3 (N.D.N.Y. Aug. 7, 2023) (quoting *Tangreti*, 983 F.3d at 619).

Here, the FAC does not allege that the individually named Defendants fired the projectiles and pepper balls at Plaintiff. However, even under the new paradigm, defendants need not actually "pull the trigger," or use force themselves, to be liable for excessive force as a direct participant. "A defendant who plans or directs an unreasonable use of force is liable for the resulting

19

constitutional violation as a 'direct participant.'" *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014). "In this Circuit, a 'direct participant' includes a person who authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally." *Id.*; *see also Campbell v. City of Yonkers*, 19 CV 2117 (VB), 2023 WL 4867459, at *9 (S.D.N.Y. July 31, 2023).

Additionally, even after *Tangreti*, courts in this district have found that "an official's conduct in making and executing policy, [...], may satisfy [the] requirement of personal involvement if such conduct meets the elements required to establish an underlying constitutional violation and is undertaken with the required state of mind." *Lalonde v. City of Ogdensburg*, 662 F. Supp. 3d 289, 322 (N.D.N.Y. 2023) (citation omitted). "To establish a policy-maker's personal involvement, the plaintiff must allege that the official was responsible for the policy and a 'tangible connection between their policymaking conduct and the alleged harm.'" *Robinson v. Phillips*, No. 9:22-CV-0945 (BKS/DJS), 2023 WL 3170389, at *2 (N.D.N.Y. May 1, 2023) (citation omitted). Policymakers may be liable because "[a]n individual who creates a policy or custom whereby the constitution is violated . . . is more directly and personally involved in the constitutional violation than someone who is only negligent in his supervision of the official committing the underlying offense." *Stone #1 v. Annucci*, No. 20-CV-1326 (RA), 2021 WL 4463033, at *6-8 (S.D.N.Y. Sept. 28, 2021).

Thus, Plaintiff must allege facts capable of suggesting that the individually named Defendants planned, directed, or authorized the excessive force itself, or that they created policies which are tangibly connected to the use of excessive force against Plaintiff. Here, Plaintiff has properly alleged that Defendants Crooks, Catone, Kelly, and Dalton were personally involved as direct participants or as responsible policymakers in the use of excessive force.

i.      **Defendants Crooks and Catone**

First, the Court finds that Defendants Crooks and Catone were direct participants in the alleged use of excessive force.[6]   According to the FAC, Defendants Crooks and/or Catone specifically issued the on-the-ground authorization of the use of pepper balls or projectiles.  FAC at ¶¶ 75, 77.[7]  Defendants Crooks and Catone also admitted responsibility for the decision to use pepper balls and projectiles against the RJPA protestors.  *Id.* at ¶ 50.   Other facts support the inference that Defendants Crooks and Catone authorized the use of projectiles and pepper balls, including the relatively small size of the City's police department and their alleged control over its day-to-day operations.  *Id.* at ¶ 26.  Though the FAC is inconsistent as to whether Defendant Crooks alone authorized the use of projectiles, or whether it was both Defendants Crooks and Catone, the Court resolves the lack of clarity in Plaintiff's favor and infers that both were involved in the authorization.   As such, Plaintiff has adequately alleged that Defendants Crooks and Catone ordered and authorized the alleged excessive force.  Though Defendants Crooks and Catone may

[6] Defendants Crooks and Catone argue Plaintiff abandoned any assertion that they were personally involved in his constitutional violations because he "failed to meaningfully respond" to their argument in his response.  Dkt. No. 51 at 14.  Though Plaintiff's arguments in response are far from thorough, he does respond.  Regardless, Defendants Crooks and Catone's argument that they were not personally involved does not have facial merit given the FAC's allegations pertaining to their direct involvement.

[7] These allegations distinguish this case from *Lynch v. City of New York*, 952 F.3d 67, 77 (2d Cir. 2020), which Defendant Dalton asserts supports a finding of no personal involvement.  There, the Second Circuit found that "[t]here [was] no factual allegation that [the supervisor defendant] was involved in the arrest of [the plaintiff] or in the preparation of the [plaintiff's] summonses."  *Id.* Crucially, where the facts suggested that the supervisor defendant directed that the plaintiff be denied food and water, the Court dismissed such a claim on grounds that the injury was *de minimis*, not that there was no personal involvement in the actual deprivation.  Here, just as the defendant in *Lynch* directed that the plaintiff be deprived of food and water, Defendants Crooks and Catone allegedly authorized that police in riot gear appear on the scene and fire projectiles and pepper balls into the crowd of peaceful protestors, including Plaintiff.

not have fired the projectiles, their authorization to do so is sufficient. *See Terebesi v.* 764 F.3d at 234.

Defendants Crooks and Catone argue that even if they did authorize the use of projectiles and pepper balls, "it cannot be reasonably said that [they] knew or should have known that their alleged 'authorization' would somehow cause others to deprive Plaintiff of his constitutional rights." Dkt. No. 51 at 19. But an excessive force claim under the Fourth Amendment does not require that a defendant be aware that his or her actions are unconstitutional. *Graham*, 490 U.S. at 397 (finding the objectively reasonable test can be determined "without regard to [defendant's] underlying intent or motivation."). Though *Tangreti* demands that a supervisor be subject to the same *mens rea* requirements as any other defendant, "the defendant's state of mind is not a matter that a plaintiff is required to prove" in excessive force claims outside of the Eighth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 34 (2d Cir. 2017). What matters is whether the decision to authorize projectiles and pepper balls was *objectively* reasonable. *See Belyea v. City of Glen Cove*, 20-CV-5675 (MKB), 2022 WL 3586559, at *21 (E.D.N.Y. Aug. 22, 2022) (defendant must act only with "knowledge of the facts that rendered the conduct illegal") (citation omitted).

Therefore, the Court finds that the excessive force claim survives against Defendants Crooks and Catone.

### ii.    Defendants Kelly and Dalton

The Court also finds that Defendants Kelly and Dalton were personally involved as policymakers. Again, pleading a supervisor's personal involvement through policy creation requires a plaintiff to plausibly allege "that the official was responsible for the policy and a 'tangible connection between the policymaking conduct and the alleged harm.'" *Robinson*, 2023 WL 3170389, at *2 (quoting *Lalonde*, 2023 WL 2537626, at *18). Put differently, supervisors are

liable "where unconstitutional acts are *the result* of a policy promulgated by the defendant." *Brock v. Wright*, 315 F.3d 158, 166 (2d Cir. 2003) (emphasis in original).

First, drawing all inferences in favor of Plaintiff, the FAC plausibly alleges that the individually named Defendants, including Defendants Kelly and Dalton, "were the officials individually responsible for establishing and enforcing" the City and County's policies in response to the protest on July 30, 2020. *Bentley v. Dennison*, 852 F. Supp. 2d 379, 397 (S.D.N.Y. 2012) (finding personal involvement through policy).[8]   For example, Plaintiff alleges that all of the individually named Defendants "jointly and individually . . . were the municipal policy makers involved in making decisions leading up to and on July 30, 2020, as to how the City of Saratoga Springs and the County of Saratoga would respond to and handle the 'Back the Blue' rally and the racial justice and police accountability counter rally." FAC at ¶ 49.   Plaintiff also alleges that "Defendants Kelly, Dalton, Crooks, Catone, [and] Zurlo . . . or a sub-set of the above which cannot be determined definitively prior to pretrial discovery in this case, developed a plan and strategy leading up to and on July 30, 2020 . . . ." *Id.* at ¶ 54.   Such undifferentiated allegations, standing alone, might be insufficient to adequately allege that the individually named Defendants were responsible for policymaking.  *See Taranto v. Putnam Cnty.*, No. 21-CV-2455 (KMK), 2023 WL 6318280, *14 (S.D.N.Y. Sep. 28, 2023) (quotation omitted) ("conclusory allegations" that a defendant created policy are not enough to "sustain a claim of personal involvement.") (quotation

---

[8] This inquiry, whether Defendants were "responsible" for the policy in question, is separate from the similar inquiry in the municipal liability context regarding whether an individual is a final policymaker.   Here, Plaintiff attempts only to assign liability to the individually named Defendants, not to the municipality.   Therefore, there is no need to allege that the individually named Defendants are "final policymakers" of the municipality, a requirement in the *Monell* context imposed to ensure that the municipality is only held liable for those acts which are attributable to the municipality itself.   Instead, so long as the individually named Defendants took acts (i.e., created policy) that are tangibly connected to the alleged excessive force against Plaintiff, those Defendants may be held individually liable.

omitted).  But Plaintiff also alleges that Defendants Kelly, Dalton, Crooks, and Catone in particular were "specifically engaged in" the creation of hostile operational plans for the July 30, 2020 protest which targeted racial justice and police accountability activists, including Plaintiff.  *Id.* at ¶¶ 39, 40.  Additionally, Defendant Kelly was the Mayor and Defendant Dalton was the Commissioner of Public Safety, which adds plausibility to the notion that they were responsible for the policy that governed the relevant law enforcement response.[9]  *See Donovan v. Norwich City Sch. Dist.*, No. 3:19-CV-1638, 2022 WL 623904, at *11 (N.D.N.Y. Mar. 3, 2022) (finding in the *Monell* context that "[a]n official's title, though not dispositive of his authority to make policy, is relevant for the inferences fairly to be drawn therefrom.") (citation and internal quotation marks omitted).

Second, as to whether the alleged policies caused Plaintiff's harms, the alleged plan devised by Defendants Kelly and Dalton (as well as Defendants Crooks and Catone) was responsible for the presence of additional law enforcement officers in riot gear and the weaponry which allegedly was used against Plaintiff.  Additionally, the operational plans are alleged to have specifically targeted Plaintiff on at least one other occasion, FAC at ¶ 33, and Plaintiff alleges that on July 30, 2020, law enforcement officers "verbally identified" him, suggesting that Defendants' plan included instructions to target Plaintiff, *id.* at ¶ 76.  At this stage, these allegations are sufficient to plausibly suggest that Defendants Kelly and Dalton devised a plan to respond to the protest on July 30, 2020, and that Plaintiff's harms resulted from the implementation of that plan.  Thus, the FAC

---

[9] Defendant Dalton argues that it was law enforcement officers from Saratoga County, and not the City, which allegedly used improper force, and therefore, she could not be held liable as a policymaker because those officers do not report to her.  Dkt. No. 39-2 at 25.  But the FAC does not specify which law enforcement group used particular kinds of force, and indeed, states that Defendants Crooks and Catone, officers with the City, authorized the use of projectiles and pepper balls.

sufficiently alleges that Defendants Kelly and Dalton were personally involved in the use of excessive force.[10]

Though some of Plaintiff's key allegations are made upon information and belief, "[a]llegations may be made on information and belief when the facts are peculiarly within the knowledge of the defendants" so long as "the complaint [] allege[s] facts demonstrating the basis for the information and belief." *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 737 F. Supp. 2d 137, 144 (S.D.N.Y. 2010) (quotation omitted). Here, the details of law enforcement's response are undoubtedly within the knowledge of Defendants, and several facts provide the basis for Plaintiff's allegations. Plaintiff has specifically alleged the existence of similar directives and operational plans in relation to a similar protest in 2021, and therefore, Plaintiff has a legitimate basis for believing that such plans and directives existed with respect to the July 30, 2020 protest, as well. FAC at ¶ 33. Moreover, Plaintiff has alleged that Defendant Dalton issued a statement saying she "witnessed everything" and stood "by the actions of the Saratoga Springs Police Department on the night of July 30th." *Id.* at ¶¶ 52, 68. Finally, Plaintiff has pointed to text messages sent by Defendant Dalton in July 2021 in which she said she had "bloodlust" towards the protestors, lending credence to the inference that the alleged plan would include the use of force. *Id.* at ¶ 36.

---

[10] The FAC also alleges that Defendants Kelly, Dalton, Crooks, and Catone "consistently expressed significant and ongoing and unjustified hostility towards the racial justice and police accountability movement . . . . [and that] [t]he expression of such unjustified hostility . . . was such a clear and consistent practice over this period of time as to have constituted a municipal policy or custom." *Id.* at ¶ 30. Undoubtedly, the positions of municipal leaders can provide the basis for a policy or custom. But here, the Court finds that a general custom of alleged "hostility," is insufficiently tangibly connected to Plaintiff's constitutional violation to support the individually named Defendants' personal involvement. *See Robinson*, 2023 WL 3170389, at *2. Though hostile remarks and attitudes can inflame tensions, they are too attenuated for the purpose of imposing individual liability. Instead, the Court relies upon the allegations of Defendant Crooks and Catone's authorization of the use of projectiles and pepper balls, and the allegations of Defendant Kelly and Dalton's creation of specific plans to respond to protestors, to sustain Plaintiff's excessive force claim.

Rather than relying on pure speculation, Plaintiff's allegations are based on the reasonable and circumstantially supported belief that the allegedly unconstitutional law enforcement response to the protest in question was planned and implemented by the City's law enforcement officials.  To be clear, these facts alone will be insufficient to carry the day at the summary judgment stage.  But on a motion to dismiss, the allegations suffice.

Moreover, that Plaintiff's injuries resulted from a single incident does not rid Defendants Kelly and Dalton of personal involvement.  Multiple Defendants point to cases in this circuit which state that "[a]llegations involving only a single incident are generally insufficient to demonstrate the existence of an official policy or custom for purposes of establishing personal involvement[.]" *Taranto*, 2023 WL 6318280, at *14 (quoting *Parris v. N.Y. State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013)); Dkt. No. 39-2.  But in these cases, the plaintiffs' attempts to establish the personal involvement of the policymaker are based on the policymakers' *failure* to train, supervise, or create sufficient disciplinary policies.  *See Taranto*, 2023 WL 6318280, at *14 (training and supervision); *Parris*, 947 F. Supp. at 365 ("plaintiff alleges that the defendants allowed inadequate security practices to exist").[11]  In those circumstances, where the alleged policy is unwritten, a single incident of excessive force is insufficient to establish that inadequate training or supervision exists because the incidents are all that the Court has to assess whether there is, in fact, a policy or custom in place.  Here, Plaintiff alleges that Defendants Kelly and Dalton actively made a concrete and "detailed" policy which led to the constitutional violation in question: the operational plan to respond to RJPA protestors.  FAC at ¶ 33; *see Brunache v. Annucci*, 22-CV-196(JLS), 2023 WL 146850, at *13 (W.D.N.Y. Jan 9, 2023) (distinguishing a written "policy that

---

[11] Defendant Dalton's citation to *Jones v. Town of East Haven* is unavailing because the citation conflates the existence of an official policy or custom for purposes of municipal liability with the personal involvement of policymaking supervisors.  691 F.3d 72, 81 (2d Cir. 2012).

specifically was used to deny [the plaintiff] [pain medications]" from conclusory allegations of unwritten policies); *Belyea*, 2022 WL 3586559, at *22 (finding personal involvement where defendant proposed a single budget which eliminated plaintiff's job).[12]

In summary, the excessive force claim against Defendants Kelly and Dalton survives.[13]

### iii.    Defendant Zurlo

However, Plaintiff has failed to allege that Defendant Zurlo was personally involved in the use of excessive force.  First, Plaintiff fails to allege that Defendant Zurlo was a direct participant, either through allegations of his presence on July 30, 2020 or through allegations that he ordered or authorized the use of unreasonable force.  Second, Plaintiff fails to allege that Defendant Zurlo was responsible for policy or custom which led to the alleged excessive force.  Beyond unparticularized allegations against all Defendants, the FAC alleges, at most, that Defendant Zurlo agreed to supply additional law enforcement officers in riot gear, an armored vehicle, and weapons to the city "as requested."  *Id.* at ¶ 61.  Indeed, Defendant Crooks and Catone allegedly admitted that they requested the additional support from the County.  *Id.* at ¶ 50.  Moreover, unlike with

---

[12] However, Plaintiff's conclusory allegation that all Defendants failed to train law enforcement officers to properly respond is insufficient to establish liability against any Defendant.  First, as pointed out above, to establish a failure to train as an actual policy for purposes of a supervisor's personal involvement or *Monell* liability requires more than one or two incidents.  *See Taranto*, 2023 WL 6318280, at *14; *see also Brown v. Fire Dep't of City of New York*, 19-cv-2400 (LDH), 2020 WL 6940992, at *9 (E.D.N.Y. Nov. 25, 2020) ("courts in the Second Circuit have found that two incidents did not support an inference of a policy or custom under *Monell*").  Regardless, the allegation is entirely conclusory and does not point to any specific deficiency.  *See Wilson v. Cnty. of Onondaga*, 5:20-CV-1489 (DNH/TWD), 2022 WL 3141764, at *9 (N.D.N.Y. Apr. 21, 2022).

[13] The Court notes that the individually named Defendants ultimately may not be held liable in their individual capacities for mere ratification of the events on July 30, 2020 after the fact because such ratification is not the cause of Plaintiff's injuries.  Plaintiff's many allegations of ratification are instead relevant to the liability of the City and the County, where the ratification of actions by municipal officials might be sufficient to impute liability to the municipality.  Should discovery reveal that the individually named Defendants played no role in the creation of the plan to respond on July 30, 2020 with force, but merely ratified it after the fact, Plaintiff's claim against these Defendants may fail.

respect to the other individually named Defendants, Plaintiff has not alleged any circumstantial facts capable of supporting his conclusory allegations of Defendant Zurlo's creation of policy. Even granting Plaintiff all favorable inferences, the Court cannot find that Defendant Zurlo is responsible for the policies governing the law enforcement response on July 30, 2020. Thus, the Court finds that Plaintiff has not adequately alleged that Defendant Zurlo was personally involved in the use of excessive force and dismisses the first claim against him.

### C.    EQUAL PROTECTION CLAIMS

#### 1.    Selective Enforcement

Plaintiff next makes a claim under the Fourteenth Amendment based on his right to be free from discrimination. FAC at ¶ 102. The Fourteenth Amendment's Equal Protection Clause "requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "There are 'a number of common methods' of 'plead[ing] an equal-protection-based cause of action,' including: (1) 'point[ing] to a law or policy that expressly classifies persons on the basis of race,' (2) 'identify[ing] a facially neutral law or policy that has been applied in an intentionally discriminatory manner,' (3) alleg[ing] that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus,' (4) 'assert[ing] a 'selective enforcement' claim by showing they were treated differently based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person,' and (5) 'assert[ing] a so-called 'class of one' claim by alleging that they were intentionally treated differently from others similarly situated and that there was no rational basis for this difference in treatment.'" *Smith v. City of Syracuse,* No. 5:19-cv-00997 (BKS/ATB), 2020 WL 1937411, at *5 (N.D.N.Y. Apr. 21, 2020) (quoting

*Benacquista v. Spratt*, 217 F. Supp. 3d 588, 597 (N.D.N.Y. 2016) (citations and internal quotation marks omitted)).

Plaintiff does not specify under which theory his equal protection claim arises, but it appears he proceeds on a selective enforcement theory. *See* FAC ¶ 4 ("The two protests on July 30, 2020, were handled in starkly different manners by the defendant municipalities and municipal officials, reflecting express and *de facto* municipal policies, practices, and customs to favor the 'Back the Blue' protestors over the racial justice and police accountability activists."); *see also* Dkt. No. 46 at 19-20 (explaining that "animosity and disdain" dictated the difference in approaches to the two protests).

To prevail on a selective enforcement claim, "a plaintiff must prove that '(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.'" *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)). To be "similarly situated" under the first step of the analysis, "the plaintiff's and comparator's circumstances must bear a reasonably close resemblance." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (internal quotation marks omitted). However, they need not be "identical." *Id.* Put differently, a plaintiff must show that "[]he was similarly situated in all material respects to the individuals with whom []he seeks to compare h[im]self." *Graham v. Long Island Rail Road*, 230 F.3d 34, 39 (2d Cir. 2000) (internal quotation marks omitted). "As a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury." *Schachtler Stone Prod., LLC v.*

*Town of Marshall*, No. 6:21-CV-001100 (AMN/MJK), 2024 WL 4025862, at *14 (N.D.N.Y. Sept. 3, 2024) (citations omitted).

At step one, the Court is satisfied that Plaintiff has adequately pled that his circumstances as part of the RJPA protest were similar in "all material respects" to the proposed comparators, the Back the Blue protesters. The FAC alleges that the two groups of protesters were holding rallies at the same time in the same general location, yet the police treated the RJPA protestors, and Plaintiff specifically, with greater hostility including, *inter alia*, shooting them with pepper balls even though they were peacefully protesting. Thus, Plaintiff alleges that he was engaged in similar activity to the Back the Blue protestors yet was met with a more hostile response. "While far from thorough, the Amended Complaint 'need not contain detailed factual allegations[.]'" *Schachtler*, 2024 WL 4025862, at *15 (quotations omitted). "Discovery in this case may ultimately ... render the resemblance between" the RJPA protesters and the Back the Blue protestors "less reasonably close, but [a]t this early stage in the litigation ... plaintiffs' failure to plead such fact-specific details should not bar their [selective enforcement] claims." *Id.* (internal quotation marks omitted). It is enough that this Court finds that "it is plausible that a jury could ultimately determine that the comparators are similarly situated." *Panzella v. City of Newburgh*, 231 F. Supp. 3d 1, 8 (S.D.N.Y. 2017). That the FAC might suggest that the RJPA protestors were protesting in the street, but might not suggest that the Back the Blue protestors were in the street, does not defeat the claim for selective enforcement. The FAC simply does not speak of the Back the Blue protestors' location with the same degree of specificity. Moreover, the FAC alleges that the Back the Blue protestors were engaged in hostile acts towards the RJPA protestors throughout the day. FAC at ¶¶ 48, 53. Therefore, read in the light most favorable to Plaintiff, the Court finds that the FAC plausibly alleges that the two groups were alike in all "material" respects: both groups were protesting in the

same general area and were potentially engaged in improper activities which might prompt a law enforcement response. *Graham*, 230 F.3d at 39.

At step two, Plaintiff has properly alleged that his treatment on July 30, 2020 was the result of Defendants Crooks, Catone, Kelly, and Dalton's hostility towards the RJPA protestors' constitutionally protected right to protest for racial justice and police accountability and a bad faith intent to injure Plaintiff. Because Plaintiff must allege that each individual Defendant held the required motive or intent, the Court more thoroughly addresses step two below with respect to each Defendant. However, nearly all Defendants argue that because Plaintiff has not alleged that all the RJPA protestors were people of color, and that all the Back the Blue protestors were white, he has failed to state a selective enforcement claim. Dkt. No. 36-2 at 29; Dkt. No. 37-2 at 13; Dkt. No. 39-2 at 19 (referencing FAC at ¶¶ 5, 91). Their argument takes an overly narrow view of selective enforcement and of the FAC's theory of selective enforcement. As explained below, Plaintiff does not rely on racial prejudice alone, but instead, points to a bad faith intent to injure Plaintiff and an intent to inhibit the RJPA protestors' First Amendment rights to establish the improper bases of disparate treatment. These alone, without any finding of racial prejudice, would be sufficient to sustain Plaintiff's claim on the merits. *See, e.g., Center for Bio-Ethical Reform, Inc. v. Black*, 234 F. Supp. 3d 423, 436 (W.D.N.Y. 2017) (sustaining selective enforcement claim based on anti-abortion protest's treatment compared to counter-protestors). Instructively, in *Hall v. Warren*, the court noted that though many of the protestors speaking out against "racially-motivated police action" were white, the plaintiff's selective enforcement claim survived because "Plaintiffs . . . pled that Defendants punished them for the exercise of their constitutional rights, i.e., their freedom to speak out against racially-motivated police action." 21-cv-06296-FPG, 2022

31

WL 2356700, at *10 (W.D.N.Y. June 30, 2022). Plaintiff has done the same here, and thus, his selective enforcement claim is not defeated by the lack of racial homogeneity.[14]

### 2.     Personal Involvement

Again, the inquiry does not end there. Plaintiff must sufficiently allege the personal involvement of each individually named Defendant in the selective enforcement against Plaintiff. *Morabito*, 803 Fed. Appx. at 466.

### i.     Defendants Crooks and Catone

The Court incorporates its findings above and finds that Defendant Crooks and Catone were direct participants in the selective enforcement on July 30, 2020 and that their alleged conduct in authorizing the use of projectiles and pepper balls was plausibly a proximate cause of Plaintiff's injuries. With respect to the selective enforcement claim specifically, Plaintiff must satisfactorily allege that Defendants Crooks and Catone's conduct in authorizing and directing the use of pepper balls and projectiles "was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Hu*, 927 F.3d at 91 (citation omitted). Given the difficulty in pleading intent and motive, Plaintiff is not required to marshal evidence of Defendants' subjective intent at this stage. *See Rodrigues v. Incorporated Village of Mineola*, No.

---

[14] To the extent that Plaintiff may be asserting a class of one equal protection claim, the claim fails. A class of one equal protection claim, unlike a selective enforcement claim, does not require a finding of Defendants' animus towards Plaintiffs. *Schachtler*, 2024 WL 4025862, at *15 (citing *Hu*, 927 F.3d at 94). But it does require Plaintiff to show that he is "*prima facie* identical" with the comparator. *Id.* Here, there are simply insufficient allegations to determine whether Plaintiff was "*prima facie* identical" to the Back the Blue Protestors. The FAC lacks allegations as to whether the Back the Blue protestors were similarly engaged in protests in the streets, and whether other protestors were similarly singled out by law enforcement.

16-CV-1275 (JFB)(GRB), 2017 WL 2616937, at *8 (E.D.N.Y. June 16, 2017) (finding identification of comparators and disparate treatment alone sufficient to satisfy the second prong at the motion to dismiss stage); *Rizvi v. Town of Wawarsing*, No. 112CV1396GLSRFT, 2013 WL 12177175, at *5 & n.10 (N.D.N.Y. Jan. 15, 2013) (finding second prong satisfied despite "gaps" in the allegations because the court "presume[d] that [plaintiff] possesse[d] the requisite good faith belief that discovery will confirm her allegations of selective enforcement").  On a motion to dismiss, it is enough that Plaintiff does not rely on "the mere fact that something bad happen[ed] to a member of a particular group" to suggest Defendants acted with a discriminatory intent. *Contra Sanchez v. Shanley*, 9:20-CV-0648 (GTS/ML), 2020 WL 6440272, at *5 (N.D.N.Y. Nov. 3, 2020) (quoting *Williams v. Calderoni*, No. 11-CV-3020, 2012 WL 691832, *7 (S.D.N.Y. Mar. 1, 2012)).  Plaintiff has met this bar.

First, drawing all reasonable inferences, the FAC properly alleges that Defendants Crooks and Catone's authorization of the use of pepper balls and projectiles was motivated by a desire to inhibit the First Amendment rights of Plaintiff and the RJPA protestors.[15]  The FAC directly alleges that the overall response on July 30, 2020, including as pertinent to Defendants Crooks and Catone, the "use of violence," was designed to "scare and discourage" the RJPA protestors from exercising

---

[15] Plaintiff's selective enforcement claim "coalesces" with his First Amendment claim to the extent that it relies on Defendants' motive to hinder his First Amendment rights.  Had this Court found that his First Amendment allegations failed to state a claim, the Court may have also had to dismiss Plaintiff's selective enforcement claim.  *See Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) ("Due to the manner in which they have cast their contentions throughout this action, the plaintiffs' selective prosecution and retaliation claims 'coalesce.'" (quoting *African Trade & Info. Ctr. v. Abromaitis*, 294 F.3d 355, 363 (2d Cir.2002))).  Here, as explained below, the First Amendment claim survives, so there is no need to dismiss the selective enforcement claim.  Even had the First Amendment claim been dismissed, Plaintiff's selective enforcement claim would not have necessarily been dismissed in its entirety because Plaintiff also adequately alleges his disparate treatment was improperly motivated by a bad faith intent to injure, not just the exercise of his First Amendment rights.

their rights.  FAC at ¶¶ 8, 9.  The FAC also includes facts which lead to the reasonable inference that Defendants Crooks and Catone's authorization of the use of pepper balls and projectiles was motivated by an intent to inhibit Plaintiff's right to express his perceived anti-police message.  *See* FAC at ¶ 44 (alleging the more hostile Back the Blue protestors were not met with similar force); *id.* at ¶ 51 (alleging Defendants Crooks and Catone misled the public as to the nature of the RJPA protestors).

Second, the FAC also plausibly alleges that Defendants Crooks and Catone's authorization of the use of pepper balls and projectiles was motivated by a bad faith intent to injure Plaintiff specifically.  *Hu*, 927 F.3d at 91.  Plaintiff alleges that he was "a well-known and recognized leader and organizer," and that during his peaceful protest, law enforcement officers "verbally identified to each other where [Plaintiff] was located among the protestors, indicating that he was a particular target of their actions."  FAC at ¶¶ 42, 76.  The FAC also points to other circumstantial facts suggesting that Defendants Crooks and Catone (as well as Defendants Kelly and Dalton) might have held a particular bad faith intent to injure Plaintiff on July 30, 2020, including an operational plan in part developed by Defendants Crooks and Catone to respond to the separate July 2021 protest which allegedly instructed law enforcement to look out for Plaintiff specifically.  *Id.* at ¶ 33.  The FAC's allegations that Defendant Crooks and Catone authorized violence against peaceful protestors, including Plaintiff, without a clear directive to the protestors to disperse from the scene similarly supports the existence of such an intent.  *Id.* at ¶¶ 75, 86.  These allegations are sufficient at this stage to make plausible a bad faith intent to injure.  *See Rizvi*, 2013 WL 12177175, at *5. Therefore,  Plaintiff  has  properly  alleged  that  Defendants  Crooks  and  Catone  were  directly

involved in the selective enforcement, and thus, the selective enforcement claim survives against them.[16]

### ii.    Defendants Kelly and Dalton

Again, the Court incorporates its findings above and finds that Defendants Kelly and Dalton were sufficiently alleged to be personally involved as responsible policymakers related to the law enforcement response on July 30, 2020, and that their policies were plausibly a proximate cause of Plaintiff's injuries. As to the specific mindset necessary for a selective enforcement claim, Plaintiff's allegations meet the relatively low pleading standard. *See Rizvi*, 2013 WL 12177175, at *5.

First, Plaintiff properly alleges that Defendants Kelly and Dalton were motivated by an intent to inhibit Plaintiff's exercise of his First Amendment rights. Plaintiff directly alleges that Defendants Kelly and Dalton (along with the other individually named Defendants) acted with at least an intent to inhibit Plaintiff and the other RJPA protestors' right to protest in creating the policies and plans which governed the July 30, 2020 response. FAC at ¶¶ 8, 9. The FAC also includes other facts which suggest that the plans and policies which Defendants Kelly and Dalton are alleged to have created were intended the quell the exercise of Plaintiff's rights. *See* FAC at ¶ 44 (alleging the more hostile Back the Blue protestors were not met with similar force, suggesting the planners of the response to the two protests supported the Back the Blue message); *id.* at ¶ 52

---

[16] Again, Defendants Crooks and Catone attempt to argue that Plaintiff has abandoned his selective enforcement claim. Dkt. No. 51 at 21. But Plaintiff does assert in his response to their motion that Defendants were motivated by "animosity and disdain towards plaintiff and others due to their message and racial prejudice[,]" and he does attempt to counter Defendants' argument regarding the racial makeup of the protest groups. Dkt. No. 46 at 19-20. Though the opposition is again far from thorough, and despite the fact that Plaintiff fails to point to specific allegations in the FAC to support his claim, the FAC is sufficiently clear on its face that it supports a selective enforcement claim against Defendants Crooks and Catone. A poor argument is not an abandoned argument.

(alleging Defendants Kelly and Dalton approved and ratified a statement which falsely depicted the RJPA protestors and did not detail the Back the Blue protestors' hostility).

Second, the FAC adequately alleges that Defendants Kelly and Dalton intended, in bad faith, to injure Plaintiff. Again, drawing all favorable inferences from the FAC, the plans and policies governing the response on July 30, 2020, which Defendants Kelly and Dalton are alleged to have created, are alleged to have specifically targeted Plaintiff. FAC at ¶¶ 39, 40. And again, Defendant Dalton is also alleged to have said that she had a "bloodlust" towards RJPA protestors at a July 2021 protest. *Id.* at ¶ 36. Though these allegations, if proven, might not carry the day and establish that Defendants Kelly and Dalton held a bad faith intent to injure Plaintiff, they are sufficient at this stage to plausibly allege the existence of such an intent. *See Rizvi*, 2013 WL 12177175, at \*5.

### iii.    Defendant Zurlo

Plaintiff has failed to allege the personal involvement of Defendant Zurlo in the alleged selective enforcement. Again, Defendant Zurlo is not alleged to have been responsible for the policies governing the law enforcement response on July 30, 2020, nor is he alleged to have been directly involved in the alleged disparate treatment. Even if he was involved, the FAC contains no non-conclusory facts which might suggest that he held the requisite intent. Therefore, the selective enforcement claim against him is dismissed.

### D.    FIRST AMENDMENT RETALIATION

Plaintiff next asserts a claim of retaliation under the First Amendment. FAC at ¶ 106. "To plead a First Amendment retaliation claim a plaintiff must show that: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. County*

*of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).   "With respect to the third element, the plaintiff[]
[generally] must show that [his] First Amendment rights were 'actually chilled.'"   *Searle v. Red
Creek Cent. Sch. Dist.*, No. 22-2049-cv, 2023 WL 3398137, at *2 (2d Cir. May 12, 2023)
(summary order) (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)).   "However,
in limited contexts, other forms of harm have been accepted in place of this 'actual chilling'
requirement."  *Id.* (quoting *Zherka v. Amicone*, 634 F.3d 642, 645 (2d Cir. 2011)).

First, Plaintiff has plausibly alleged that he has an interest protected by the First
Amendment.  Certain Defendants argue that Plaintiff did not have First Amendment protections at
the time of the protest because he and his fellow protesters were interfering with the traffic in the
area, giving the police authority to intervene and end the protest.  *See* Dkt. No. 36-2 at 33.  Indeed,
it is "axiomatic, for instance, that government officials may stop or disperse public demonstrations
or protests where 'clear and present danger of riot, disorder, interference with traffic upon the
public streets, or other immediate threat to public safety, peace, or order, appears.'"  *Jones*, 465
F.3d at 56–57 (quoting *Cantwell v. Connecticut,* 310 U.S. 296, 308 (1940)).  However, this law
does not compel the conclusion that Plaintiff's First Amendment claim must be dismissed.  Read
in the light most favorable to Plaintiff, the FAC's allegations of peaceful intrusion "across part of
the roadway" do not equate to a "clear and present danger of riot, disorder, [or] interference with
traffic upon the public street[,]" especially absent any allegations of actual interaction with vehicles
on the road.  *Id.*; *see* FAC at ¶ 66.  Moreover, the FAC alleges that the RJPA protestors "continued
to peacefully stay on the scene, including some in the roadway for approximately an hour" after
the law enforcement response, "and then dispersed without any additional interaction with the
police."  FAC ¶ 89.  Again, read favorably, such allegations suggest that the RJPA protestor's
activities did not pose a threat to public "peace, safety, or order."  *Jones*, 465 F.3d at 56–57.

Therefore, it is plausible to conclude that there was no legitimate basis to stop or interfere with the protest. *See Jones*, 465 F.3d at 58 ("Neither energetic, even raucous, protesters who annoy or anger audiences, nor demonstrations that slow traffic or inconvenience pedestrians, justify police stopping or interrupting a public protest." (citations omitted)).

Second, the Court finds that Plaintiff has sufficiently alleged that Defendants Crooks, Catone, Kelly, and Dalton's actions were motivated or substantially caused by Plaintiff's exercise of his First Amendment rights. Given the need to allege such motivation or causation for each Defendant, the Court addresses this element below in its analysis of the allegations of each Defendant's personal involvement in violating Plaintiff's First Amendment rights.

Third, Plaintiff has properly alleged an injury. Here, the allegations indicate that after the police stopped firing pepper balls, law enforcement withdrew, and the RJPA protest continued for another hour. FAC at ¶ 89. Defendants argue that these allegations indicate that Plaintiff's speech was not "chilled," and thus, his First Amendment retaliation claim fails. Nevertheless, drawing all reasonable inferences in Plaintiff's favor, it is plausible to conclude that Plaintiff's rights were "chilled" while he was being shot with pepper balls and projectiles. Under these circumstances, Plaintiff sufficiently alleges that his First Amendment rights were curtailed. *Armstrong v. City of Rochester* is instructive. No. 21-CV-6717-FPG, 2022 WL 16856658, at *5 (W.D.N.Y. Nov. 10, 2022). There, the plaintiff was participating in public demonstrations calling for "racial justice and reformed policing" when law enforcement began firing pepper balls, pepper spray, and tear gas at the protestors. *Id.* at *1. Defendants argued that Plaintiff failed to allege that his speech was chilled for the purposes of a First Amendment retaliation claim. *Id.* at *5. However, the court found that "at the very least, the Amended Complaint intimates that Plaintiff was prevented from further protesting while they were being attacked by law enforcement. At this stage, at least,

Plaintiff's First Amendment claims may proceed." *Id.* The court's reasoning applies here. Though Plaintiff failed to specifically allege that his speech was chilled during the law enforcement response on July 30, 2020, the Court nevertheless draws the reasonable inference that Plaintiff's protest activity was in fact chilled while Plaintiff was being shot with projectiles and pepper balls.

In the alternative, Plaintiff has sufficiently alleged a non-speech injury capable of carrying his First Amendment retaliation claim. Defendants argue that the Second Circuit has definitively established that First Amendment retaliation claims require that a defendant's conduct chill a plaintiff's speech. Dkt. No. 33-1 at 15-16; Dkt. No. 36-2 at 33; Dkt. No. 37-2 at 14; Dkt. No. 39-2 at 20-21. Plaintiff's attempt to circumvent the purported "actually chilled" requirement by citing *Bennett v. Hendrix*, 423 F. 3d 1247, 1254 (11th Cir. 2005), *Washington v. County of Rockland*, 373 F.3d 310 (2d Cir. 2004), and *Morrison v. Johnson*, 429 F.3d 48 (2d Cir. 2005), is largely unsuccessful. Each provides for a lesser standard, but the in-circuit decisions cited are limited to the public employment context and do not apply to retaliation claims brought by private citizens. *See Morrison*, 429 F.3d at 51; *Washington*, 373 F.3d at 310. *Bennett* applies a lower standard based on a claim brought by a private citizen, but it comes from the Eleventh Circuit, and thus, does not contradict Defendants' assertion regarding binding law from the Second Circuit. 423 F.3d at 1251. However, Defendants overlook other Second Circuit law which dictates that chilled speech is not required in all instances. The Second Circuit has noted that "[w]e have sometimes given the impression that silencing of the plaintiff's speech is the only injury sufficient to give a First Amendment plaintiff standing." *Dorsett*, 732 F.3d at 160. "Chilled speech is not the *sine qua non* of a First Amendment claim. A plaintiff has standing if he can show either that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm."

*Id.* (citing cases).[17]  Here, Plaintiff has alleged that Defendants' retaliatory conduct caused him physical and emotional pain and suffering after being shot with pepper balls and projectiles.  These allegations are sufficient to satisfy the third element.

### 1.    Personal Involvement

Yet again, Plaintiff must sufficiently allege the personal involvement of each individually named Defendant, this time in the alleged First Amendment retaliation against him.  *Morabito*, 803 Fed. Appx. at 466.

### i.    Defendants Crooks and Catone

The Court incorporates its findings above and finds that Defendant Crooks and Catone were direct participants in the First Amendment retaliation on July 30, 2020 and that their alleged conduct in authorizing the use of projectiles and pepper balls was plausibly a proximate cause of Plaintiff's injuries. With respect to the First Amendment claim specifically, Plaintiff must satisfactorily allege that Defendants Crooks and Catone's conduct in authorizing the use of pepper balls and projectiles was "motivated or substantially caused by his exercise of that right." *Dorsett*, 732 F.3d at 160.  Recognizing that a defendant's motive and intent are difficult to plead with specificity, courts in this Circuit find "it is sufficient to allege facts from which a retaliatory intent . . . reasonably may be inferred." *Gagliard v. Village of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994); *see also Case v. City of New York*, 233 F. Supp. 3d 372, 390 (S.D.N.Y. 2017) (applying the same standard).  Plaintiff has met this low bar.  In addition to directly alleging that the July 30, 2020

---

[17] To the extent that Defendants Zurlo, the County, and Dalton argue that Plaintiff lacks standing to assert *any* of his claims, that argument is rejected.  *See* Dkt. No. 37-2 at 11 (arguing that "the only injury plaintiff claims to have sustained is being struck by pepper balls" and that the injury does not establish standing).  As discussed, Plaintiff has alleged both a non-*de minimis* injury related to the use of pepper balls and projectiles and a temporary chill on his First Amendment rights, both of which satisfy the concrete injury requirement of Article III standing at this stage.

response, including as relevant to Defendants Crooks and Catone the "use of violence," was intended to chill protected rights, Plaintiff also alleges other facts capable of supporting an inference that Defendants Crooks and Catone's authorization was motivated by Plaintiff's message. FAC at ¶¶ 8, 9 (directly alleging intent); *id.* at ¶¶ 44, 48 (alleging disproportionate attention and response to peaceful RJPA protestors compared to hostile Back the Blue protestors); *id.* at ¶ 51 (alleging Crooks and Catone issued a misleading statement a few days later that was unfair to the RJPA protestors and ignored the hostility of the Back the Blue protestors). Thus, the First Amendment claim survives against Defendants Crooks and Catone.

### ii.    Defendants Kelly and Dalton

The Court incorporates its findings above and finds that Plaintiff has sufficiently alleged that Defendants Kelly and Dalton were personally involved as responsible policymakers concerning the law enforcement response on July 30, 2020, and that their policies were a proximate cause of Plaintiff's injuries. As to the required mindset, Plaintiff has also sufficiently alleged that Defendants Kelly and Dalton's policymaking was "motivated or substantially caused by [Plaintiff's] exercise of [his] [First Amendment] right." *Dorsett*, 732 F.3d at 160. Again, Plaintiff has met the low bar set in *Gagliard*. 18 F.3d at 195. In addition to directly alleging that the events related to July 30, 2020, including as relevant to Defendants Kelly and Dalton the "policy decisions and specific plans" leading up to the law enforcement response, were intended to chill protected rights, Plaintiff also alleges other facts capable of supporting an inference that Defendants Kelly and Dalton were motivated by Plaintiff's perceived anti-police message. FAC at ¶¶ 8, 9 (directly alleging intent); *id.* at ¶¶ 44, 48, 49 (alleging disproportionate attention and response to peaceful RJPA protestors compared to hostile Back the Blue protestors); *id.* at ¶ 52 (alleging that Defendant Dalton and Kelly, a few days later, approved and ratified a statement which was misleading about

the hostile nature of the Back the Blue protestors and unfairly depicted the RJPA protestors). Thus, the First Amendment claim survives against Defendants Kelly and Dalton.

Defendant Kelly argues that she does not hold power over the police force, and thus, could not be a responsible policymaker for their response on July 30, 2020, but the argument is unavailing.[18] Because the Saratoga Springs City Charter (the "Charter") does not grant the mayor explicit authority over the city's police force, Defendant Kelly argues that "there is no official policy that she could have promulgated pertaining to the events of July 30, 2020." Dkt. No. 33-1 at 16-17.[19] Given that Defendant Kelly's personal involvement in each of the claims is premised on her role in making the policy which allegedly caused Plaintiff's injuries, the Charter is persuasive, but it does not defeat Plaintiff's claims against her. First, the Charter does not preclude the possibility that Defendant Kelly had explicit policymaking authority over the events of July 30, 2020. The Charter indicates that "the Mayor shall have responsibility for . . . Parks." *Id.* at 21. Here, the FAC alleges that "the events that form the basis of this case took place . . . in the vicinity of Congress Park, a municipal, public park in the City of Saratoga Springs, New York." FAC at ¶ 23. Thus, the Court draws the reasonable inference that Defendant Kelly did in fact have explicit authority regarding at least components of the response on July 30, 2020. Moreover, as previously discussed, even if Defendant Kelly lacked explicit authority in the Charter, the FAC

---

[18] Defendant Kelly makes this argument specifically in relation to the First Amendment claim. However, it is applicable to her liability for all three of Plaintiff's non-municipal liability claims. The Court addresses it here but also finds that the argument does not undermine Defendant Kelly's personal involvement for any of the other claims.

[19] The Court takes judicial notice of the Saratoga Springs City Charter. *See, e.g., Fair v. Esserman*, 3:15-cv-681 (SRU), 2015 WL 7451154, at *3 (D. Conn. Nov. 23, 2015) ("I may take judicial notice of the City Charter at the motion to dismiss stage"); *Lewis v. Livingston Cnty. Ctr. for Nursing & Rehab.*, 30 F. Supp. 3d 196, 203 (W.D.N.Y. 2014) (taking judicial notice of a county resolution); *Polo v. City of New York*, No. 12-cv-3742 SJ VVP, 2013 WL 5241671, at *1 (E.D.N.Y. Sept. 17, 2013) (taking judicial notice of a municipal law).

plausibly alleges that her actions and decisions as Mayor were considered and implemented into the plan to respond on July 30, 2020. Though Plaintiff did not specifically respond to the issues raised with respect to the Charter, the Court finds that the FAC has nevertheless plausibly alleged Defendant Kelly's personal involvement in the policies governing the response on July 30, 2020. Certainly, discovery may reveal that Defendant Kelly was not involved in the formulation of such policy, but accepting the allegations as true, the Court allows the claim to move forward against her.

### iii.    Defendant Zurlo

Again, Plaintiff has failed to allege Defendant Zurlo's personal involvement in the underlying conduct, either as a direct participant or responsible policymaker. Even if he had, the FAC includes no additional facts lending credence to an inference that Defendant Zurlo's decision to provide the additional law enforcement coverage was "motivated or substantially caused by [Plaintiff's] exercise of [his] [First Amendment] right." *Dorsett*, 732 F.3d at 160. Thus, the Court dismisses the First Amendment claim against Defendant Zurlo, and Defendant Zurlo must be dismissed as a defendant in this case.

### E.    MUNICIPAL LIABILITY FOR SARATOGA COUNTY

The Court construes Plaintiff's next claim as a *Monell* claim for municipal liability against the County and the City. FAC ¶ 106. In his response, Plaintiff clarifies that the individually named Defendants are sued in their individual capacities only with respect to the first three claims. *See* Dkt. No. 44 at 24 ("To the extent the FAC is not clear on this point, plaintiff agrees that none of the individual defendants, sued in their individual capacity, are subject to being held liable under a theory of municipal liability.").

The City does not move to dismiss, and therefore Plaintiff's claims against it survive. The Court dismisses all claims against the County. The FAC's sole basis for imputing liability to the County is the notion that Defendant Zurlo is a final policymaker whose actions and decisions may be imputed to the County. FAC at ¶ 97; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Given this Court's dismissal of all of the claims against Defendant Zurlo, the claims must also be dismissed against the County. As required for municipal liability, it can hardly be said that the provision of law enforcement officers, without more, "caused the violation of the plaintiff's constitutional rights" against excessive force, selective enforcement, and retaliation based on the exercise of First Amendment rights. *Kirby v. Hanks*, 5:21-CV-886 (MAD/ATB), 2022 WL 1500857, at *4 n.6 (N.D.N.Y. May 12, 2022).

## F.    QUALIFIED IMMUNITY

The remaining individually named Defendants seek qualified immunity. The doctrine of qualified immunity shields officials from civil liability so long as their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). "[I]f officers of reasonable competence could disagree on [whether the conduct is constitutional], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

A court applies "a two-step analysis to determine whether qualified immunity bars a plaintiff's claim against government officials for civil damages related to actions taken in the course of their official duties." *Sabir v. Williams*, 52 F.4th 810, 817 (2d Cir. 2022), *cert. dismissed,*

143 S. Ct. 2694 (2023) (citing *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019)).  "Pursuant to

that analysis, qualified immunity shields federal and state officials from money damages unless

the plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right,

and (2) that the right was clearly established at the time of the challenged conduct."  *Id.* (internal

quotation marks omitted).  In assessing whether the right was clearly established, courts "do not

require a case directly on point, but existing precedent must have placed the statutory or

constitutional question beyond debate."  *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011).  The

determining question is "whether the violative nature of *particular* conduct is clearly established,"

*id.* (emphasis added), and the analysis "must be undertaken in light of the specific context of the

case, not as a broad general proposition[,]" *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (*per

curiam* ) (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001)).  "When qualified immunity shields

defendants from liability, courts may 'exercise their sound discretion in deciding which of the two

prongs of the qualified immunity analysis should be addressed first in light of the circumstances

in the particular case at hand.'"  *Sabir*, 37 F.4th at 817 (quoting *Pearson*, 555 U.S. at 236).

Qualified immunity is an affirmative defense; therefore, Defendants bear the burden of proving

that qualified immunity applies.  *See Coolick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012).

The defense of qualified immunity may properly be raised at the motion to dismiss stage

because "[q]ualified immunity provides government officials 'immunity from suit rather than a

mere defense to liability.'"  *Looney v. Black*, 702 F.3d 701, 705 (2d Cir. 2012) (quoting *Pearson*,

555 U.S. at 231).  At the motion to dismiss stage, the qualified immunity defense "'faces a

formidable hurdle ... and is usually not successful'" because it is the defendant who must plead

and prove the defense.  *Estate of Chamberlain v. City of White Plains*, 960 F.3d 100, 111 (2d Cir.

2020) (quoting *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191-92 (2d Cir. 2006)).

Defendants "must therefore show not only that the facts supporting the defense appear on the face of the complaint, but also that it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Horn v. Stephenson*, 11 F.4th 163, 170 (2d Cir. 2021).

Inasmuch as the allegations in the FAC plausibly indicate that Plaintiff and his fellow protesters were acting peacefully, lawfully, and not in a manner that presented a clear and present danger of imminent harm or other threat to the public at the time the officers shot the pepper balls or projectiles at Plaintiff and his fellow protesters, and that Defendants' actions were taken pursuant to a policy that effectively authorizes those actions, the remaining individually named Defendants have not, at this point, established their entitlement to qualified immunity. It is not beyond doubt that Plaintiff can prove no set of facts in support of his claims that would entitle him to relief.

## IX.    CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendant Kelly's motion to dismiss, Dkt. No. 33, is **DENIED in its entirety**; and the Court further

**ORDERS** that Defendants Crooks and Catone's motion to dismiss, Dkt. No. 36, is **DENIED in its entirety**; and the Court further

**ORDERS** that Defendants Saratoga County and Michael Zurlo's motion to dismiss, Dkt. No. 37, is **GRANTED in its entirety**; and the Court further

**ORDERS** that Defendants Saratoga County and Michael Zurlo are dismissed from the case; and the Court further

**ORDERS** that Defendant Dalton's motion to dismiss, Dkt. No. 39, is **DENIED in its**

**entirety**; and the Court further

      **ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the

parties in accordance with the Local Rules.

      **IT IS SO ORDERED.**

Dated: February 11, 2025
      Albany, New York

Anne M. Nardacci
U.S. District Judge